JUDGMENT

==================================================================



UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

- - - - - - - - - - - - -

NO. 96-56778
CT/AG#: CV-94-01627-GHK-BQ





MAHLON DOLMAN

        Plaintiff - Appellee

v.

MICHAEL AGEE; MICHAEL AGEE PRODUCTIONS; L & H RECORDS; THE NOSTALGIA ARCHIVE

        Defendants - Appellants

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

NO. 97-56040
CT/AG#: CV-94-01627-GHK

MAHLON DOLMAN

        Plaintiff - Appellee

v.

MICHAEL AGEE; MICHAEL AGEE PRODUCTIONS; L & H RECORDS; THE NOSTALGIA ARCHIVE

        Defendants - Appellants

- - - - - - - - - - - - - - - - - - - - - -

        APPEAL FROM the United States District Court for the Central District of California, Los Angeles .

        THIS CAUSE came on to be heard on the Transcript of the Record from the United States District Court for the

Docketed
Mld copy Ptys/Scan
Mld Notice Ptys
JS-6

ENTERED ON ICMS MAY 2 8 1999

Central District of California, Los Angeles

and was duly submitted.

ON CONSIDERATION WHEREOF, It is now here ordered and adjudged by this Court, that the judgment of the said District Court in this cause be, and hereby is AFFIRMED.


Filed and entered          October 5, 1998

Costs taxed.

A TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

MAY 1 2 1999

by
Deputy Clerk

# BILL OF COSTS

NOTE:   If you wish to file a bill of costs, it MUST be submitted on this form and filed, with the clerk, with proof of service, within 14 days of the date of entry of judgment, and in accordance with Circuit Rule 39-1. A late bill of costs must be accompanied by a motion showing good cause. Please refer to FRAP 39, 28 U.S.C. 1920, and Circuit Rule 39-1 when preparing your bill of costs.

Dolman _____ v. _____ Agee, et al. _____   CA No. 96-56778 &
                                                                        97-56040

The Clerk is requested to tax the following costs against: _____ Appellants _____

| COST TAXABLE UNDER FRAP 39, 28 U.S.C. 1920, Circuit Rule 39-1 | REQUESTED Each column must be completed | | | | ALLOWED To be completed by the clerk | | | |
|---|---|---|---|---|---|---|---|---|
| | No. Of Documents* | Pages per Document | Cost per Page** | Total Cost | No. Of Documents | Pages for Document | Cost for Page | Total Cost |
| Excerpt of Record | 7 | 73 | .13 | 66.43 | | | | |
| Appellant's Brief | | | | | | | | |
| Appellee's Brief | 20 | 46 | .13 | 119.60 | | | | |
| Appellant's Reply Brief | | | | | | | | |
| Other * | | | | | | | | |

* Additional expenses recoverable                   TOTAL: $186.03                   TOTAL: $
under 17 USC § 505 will be included with appellee's petition for atty. fees.

Other: Any other requests must be accompanied by a statement explaining why the item(s) should be taxed pursuant to Circuit Rule 39-1. Additional items without such supporting statements will not be considered.

Attorneys Fees cannot be requested on this form.

*If more than 7 excerpts or 20 briefs are requested, a statement explaining the excess number must be submitted.
** Costs per page may not exceed 20¢ or actual cost, whichever is less. Circuit Rule 39-1.

I, Dian S. Rubanoff _____, swear under penalty of perjury that the services for which costs are taxed were actually and necessarily performed, and that the requested costs were actually expended as listed. The printer's itemized statement showing actual costs per page is attached.   See affidavit attached.

Signature: _____   Date: 10/15/98

Name of Counsel (printed or typed) Dian S. Rubanoff   Attorney for: Appellee
Lane Powell Spears Lubersky LLP

Date: 5-12-99 _____   Costs are taxed in the amount of $ 186.03

Clerk of Court

By: _____ , Deputy Clerk

DC NESTEL A\BILL          REV 11/95

MAY 2 0 1999
CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

FILED
OCT 19 1998
CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| MAHLON DOLMAN, | ) | |
| | ) | CA Nos. 96-56778 and 97-56040 |
| Plaintiff-Appellee, | ) | |
| | ) | D.C. No. CV-94-01627-GHK-BQ |
| v. | ) | |
| | ) | |
| MICHAEL AGEE; MICHAEL AGEE | ) | AFFIDAVIT OF DIAN S. RUBANOFF |
| PRODUCTIONS; L & H RECORDS; THE | ) | IN SUPPORT OF APPELLEE'S BILL |
| NOSTALGIA ARCHIVE, | ) | OF COSTS |
| | ) | |
| Defendants-Appellants. | ) | |

STATE OF OREGON          )
                                        ) ss.
County of Multnomah     )

I, Dian S. Rubanoff, being duly sworn, depose and say:

1.      I was the attorney primarily responsible for preparing appellee's answering brief on this appeal, and I make this affidavit in support of his bill of costs.

2.      Appellee's answering brief and supplemental excerpts of record were prepared in-house by my law firm. As a consequence, no printer's itemized statement was prepared. The brief and excerpts were prepared at a cost to appellee of $.13 per page.

DATED this 15th day of October, 1998.

_Dian S. Rubanoff_ (signature)
Dian S. Rubanoff

Signed and sworn to before me this 15th day of October, 1998.

_____ (signature)
Notary Public for Oregon
My Commission Expires: 5/24/99

OFFICIAL SEAL
KATHY CORNETT
NOTARY PUBLIC - OREGON
COMMISSION NO.044094
MY COMMISSION EXPIRES MAY 24, 1999

Page 1 - AFFIDAVIT OF DIAN S. RUBANOFF IN SUPPORT OF APPELLEE'S BILL OF COSTS

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing bill of costs on appellants on October 15, 1998

by causing a copy thereof to be mailed on that date to their attorneys at the following addresses:

Mr. Louis P. Petrich
Mr. Vincent Cox
Leopold, Petrich & Smith
2049 Century Park East, Suite 3110
Los Angeles, California  90067-3274

Ms. Lisa G. Farley
12100 Wilshire Boulevard, Suite 700
Los Angeles, California  90025

DATED this 15th day of October, 1998.

_____
Dian S. Rubanoff

Of Attorneys for Appellee

Page 1 - CERTIFICATE OF SERVICE

PORTLAND:131222 v01

INTERNAL USE ONLY: Proceedings include all events.
96-56778 Dolman v. Agee, et al

MAHLON DOLMAN                         Jeffrey M. Batchelor, Esq.
        Plaintiff - Appellee         503-226-6151
                                     Suite 800
                                     [COR LD NTC ret]
                                     LANE POWELL SPEARS LUBERSKY
                                     520 S.W. Yamhill Street
                                     Portland, OR 97204-1383

                                     Dian S. Rubanoff, Esq.
                                     503-226-6151
                                     Suite 800
                                     [COR LD NTC ret]
                                     LANE POWELL SPEARS LUBERSKY LLP
                                     520 Southwest Yamhill
                                     Portland, OR 97204-1383

                                     Matthew P. Kesner, Esq.
                                     213-680-1010
                                     Suite 2400
                                     [COR LD NTC ret]
                                     LANE POWELL SPEARS LUBERSKY LLP
                                     333 South Hope St.
                                     Los Angeles, CA 90071


    v.

MICHAEL AGEE                         Vincent Cox, Esq.
        Defendant - Appellant        (213) 277-3333
                                     [COR LD NTC ret]
                                     LEOPOLD, PETRICH & SMITH, P.C.
                                     2049 Century Park East
                                     Los Angeles, CA 90067-3274

                                     Lisa G. Farley, Esq.
                                     310-820-3888
                                     Suite 700
                                     [COR LD NTC ret]
                                     LAW OFFICES OF LISA G. FARLEY
                                     12100 Wilshire Boulevard
                                     Los Angeles, CA 90025-7199

MICHAEL AGEE PRODUCTIONS             Vincent Cox, Esq.
        Defendant - Appellant        (See above)
                                     [COR LD NTC ret]
                                     Vincent Cox, Esq.
                                     (See above)
                                     [COR LD NTC ret]

                                     Lisa G. Farley, Esq.
                                     (See above)
                                     [NTC]

L & H RECORDS                        Vincent Cox, Esq.

Docket as of August 21, 1998 0:36 am                    Page 2    NON-PUBLIC

INTERNAL USE ONLY: Proceedings include all events.
97-56040 Dolman v. Agee, et al

MAHLON DOLMAN                        Dian S. Rubanoff, Esq.
     Plaintiff - Appellee         503-226-6151
                                    Suite 800
                                    [COR LD NTC ret]
                                    LANE POWELL SPEARS LUBERSKY LLP
                                    520 Southwest Yamhill
                                    Portland, OR 97204-1383


    v.

MICHAEL AGEE                         Vincent Cox, Esq.
     Defendant - Appellant        (213) 277-3333
                                    [COR LD NTC ret]
                                    Louis P. Petrich, Esq.
                                    310/277-3333
                                    [COR LD NTC ret]
                                    LEOPOLD, PETRICH & SMITH, P.C.
                                    2049 Century Park East
                                    Los Angeles, CA 90067-3274

MICHAEL AGEE PRODUCTIONS             Vincent Cox, Esq.
     Defendant - Appellant        (See above)
                                    [COR LD NTC ret]
                                    Louis P. Petrich, Esq.
                                    (See above)
                                    [COR LD NTC ret]

L & H RECORDS                        Vincent Cox, Esq.
     Defendant - Appellant        (See above)
                                    [COR LD NTC ret]
                                    Louis P. Petrich, Esq.
                                    (See above)
                                    [COR LD NTC ret]

THE NOSTALGIA ARCHIVE                Vincent Cox, Esq.
     Defendant - Appellant        (See above)
                                    [COR LD NTC ret]
                                    Louis P. Petrich, Esq.
                                    (See above)
                                    [COR LD NTC ret]

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY WEST GROUP—SAN FRANCISCO—(800) 888-3600

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 1998 by West Group.

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MAHLON DOLMAN, *Plaintiff-Appellee,* <br><br> v. <br><br> MICHAEL AGEE; MICHAEL AGEE PRODUCTIONS; L & H RECORDS; THE NOSTALGIA ARCHIVE, *Defendants-Appellants.* | Nos. 96-56778 <br> 97-56040 <br><br> D.C. No. <br> CV-94-01627-GHK-BQ <br><br> OPINION |

Appeals from the United States District Court
for the Central District of California
George H. King, District Judge, Presiding

Argued and Submitted
March 4, 1998—Pasadena, California

Filed October 5, 1998

Before: Melvin Brunetti, David R. Thompson, and
Thomas G. Nelson, Circuit Judges.

*Opinion by Judge Brunetti*

---

## SUMMARY

### Intellectual Property/Copyright

The court of appeals affirmed a judgment of the district court. The court held that under the Copyright Act of 1909, a musical composition in a motion picture's sound track does not lose its common-law copyright protection due to the pre-

Case 2:94-cv-01627-GHK-BQR   Document 160   Filed 05/26/99   Page 9 of 16   Page ID #:9

award as well.

AFFIRMED.

In negotiations with Dolman's attorney, Agee insisted that any licensing agreement include a provision indemnifying him against ownership claims by third parties. Dolman refused. Agee continued to sell the "Music Box" albums. Dolman sued Agee and his business entities, alleging a two-thirds interest in 55 copyrights for the Shield songs.

Agee asserted the defense of work for hire. The evidence on the issue was that Shield had worked for HRS when he wrote the songs; HRS and Victor had contracted for the recording of the songs in connection with the HRS movies; letters from Southern indicated that the songs had been composed for HRS; and invoices for Shield's services showed that he had worked on the movies.

On the issue of the parties' mutual intent when the songs were written, the evidence showed that Shield assigned his rights to Southern; after the assignment, Southern filed copyright registrations for the songs naming Shield as their composer, and renewed some of the copyrights in Shield's name; Southern had assured Shield that it would assign the songs to Shield on demand if they were not actively promoted; and Southern had licensed synchronization rights to HRS.

Agee contended that Shield lost his common-law copyright in the songs when the movies were released to film exchanges without Shield's separate copyright notice for the songs, thus placing them within the public domain. His evidence on this issue was the motion picture copyright certificates, with publication dates listed.

The district court concluded that Agee had failed to meet his burden of production on the issue of work for hire; publication of a motion picture is not a publication of musical compositions in the sound track; and Agee had willfully infringed Dolman's copyrights because he continued producing and marketing the "Music Box" records, and began importing the "Beau Hunk" records, despite knowing that *someone* owned

not introduce evidence demonstrating the nature and scope of the distribution of the Laurel & Hardy movies. As a result, the evidence is insufficient to establish the standard for publication set forth in *American Vitagraph. See American Vitagraph*, 659 F.2d at 1028 ("[M]otion picture publication occurs when prints of a film are made available under a lease or similar arrangement to theatre operators for public exhibition.") Nothing in *La Cienega* remedies this shortfall in the evidence.[4]

## IV. The District Court Did Not Err in Finding Willful Infringement

The district court found, pursuant to 17 U.S.C. § 504(c)(2), that Agee willfully infringed Dolman's copyrights because he continued producing and marketing the "Music Box" records, and began importing the Beau Hunks records, despite knowing that *someone* owned the copyrights in the music, and being presented with evidence regarding Dolman's claim of ownership.

[13] In the copyright infringement context, "willful" means acting "with knowledge that [one's] conduct constitutes copyright infringement." *See Columbia Pictures Television v. Krypton Broadcasting of Birmingham, Inc.*, 106 F.3d 284, 293 (9th Cir. 1997), *rev'd on other grounds by Feltner v. Columbia Pictures Television, Inc.*, 118 S.Ct. 1279 (1998). The district court's finding of willful infringement is reviewed for clear error. *Id.*

[14] Agee argues that the district court's findings were clearly erroneous because he demonstrated a reasonable good

[4]Because we hold that there was insufficient evidence of publication presented to the district court, we need not reach the still unsettled question of whether, under the 1909 Act, publication of a motion picture with the prescribed copyright notice provides copyright protection for the motion picture soundtrack and underlying musical compositions as "component parts" of the copyrighted movie.

leased, loaned, given away, or otherwise made available to the general public. However, mere performance or exhibition of a work does not constitute publication.

[9] It takes more in the way of publication to invalidate any copyright than to validate it. When forfeiture of copyright protection is at stake, publication of a motion picture does not occur until the film is in commercial distribution—when copies are placed in regional exchanges for distribution to theater operators.

[10] The songs were not injected into the public domain. [11] The only evidence of publication presented by Agee was the motion picture copyright certificates. The certificates created a rebuttable presumption that the movies were published for purposes of investing statutory copyright on the dates listed. However, they did not prove that the movies were "published" to the extent that they divested the songs of the common-law copyrights.

[12] Standing alone, a copyright certificate is not sufficient to demonstrate a publication that divests a work of its common-law copyright. Agee did not introduce evidence demonstrating the nature and scope of the distribution of the Laurel and Hardy movies. As a result, the evidence was insufficient to establish publication of a motion picture.

[13] In the copyright-infringement context, "willful" means acting with knowledge that one's conduct constitutes copyright infringement. [14] After consulting with counsel, Agee was told that the situation with respect to the songs was "a mess." [15] Because Agee continued to infringe the song copyrights when he knew there was a question as to their ownership, and when he was presented with evidence that Dolman was the owner, the district court did not err in finding that Agee's infringement was willful.

Case 2:94-cv-01627-GHK-BQR   Document 160   Filed 05/26/99   Page 11 of 16   Page ID #:11

tion of that work. . . . [A] motion picture exhibition where the viewing audience is merely permitted to see the work is not a publication." *Id.* at 1027 (citations omitted); *see also Nimmer* § 4.11(A) at 4-53 ("[I]t is clear that the projection or exhibition of a motion picture in theatres or elsewhere does not in itself constitute a publication").

[9] We have also held that "it takes more in the way of publication to invalidate any copyright, whether statutory or common law, than to validate it." *American Vitagraph*, 659 F.2d at 1027. "[I]n the context where a forfeiture of copyright protection is at stake . . . *publication of a motion picture does not occur until the film is in commercial distribution — when copies of a film are placed in the regional exchanges for distribution to theatre operators." Id.* at 1029 (emphasis added). Thus, under our case law, it takes "more" publication to destroy a common-law copyright than to perfect a statutory copyright.

[10] Turning to the present case, we find no evidence in the record to support a finding that the movies at issue here were "published," as that term is defined in *American Vitagraph*. Thus, we must affirm the district court's finding that the subject songs were not injected into the public domain by way of publication of the motion pictures.

[11] The only evidence of publication presented by Agee to the district court was the motion picture copyright certificates, with publication dates listed. Putting aside the district court's concerns regarding the accuracy and completeness of this evidence, Agee is correct that we must afford the copyright registrations a presumption of validity. *See Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1451 (9th Cir. 1991). Section 209 of the 1909 Act provides that a certificate of registration shall be prima facie evidence of the facts stated therein. *Id.* Thus, the certificates of registration for the subject motion pictures create a rebuttable presumption that the movies were published for

tions of the soundtracks for Laurel and Hardy movies produced by HRS and released by Metro-Goldwyn-Mayer (MGM) in the early 1930s. MGM registered copyrights for all of these movies.

In January 1932, Shield assigned his interest in the subject songs to Southern Music Publishing Company (Southern), which was the music publishing arm of Victor. In the assignment, Shield stated that the songs were his own compositions; that they were his property free from any liens or claims; and that they had not previously been assigned, transferred, or sold.

Southern then registered the original term copyrights for the songs, naming itself as copyright owner and Shield as composer, and proceeded to publish the songs as sheet music. Eventually, Southern assigned the copyrights in the songs to Peer International Corp. (Peer), and Peer later assigned the copyrights back to Southern. Southern also granted a synchronization license for the songs to HRS in 1932.

In 1958, both Southern and the Songwriters' Guild timely renewed the song copyrights in Shield's name. Subsequently, Shield established the Roy Shield Music Company for the purpose of licensing the songs to third persons during the renewal term.

In 1962, Shield died and left his entire estate to his widow, Katherine Shield. Katherine Shield died in February 1976, leaving her entire estate in equal thirds to her sister, Marguerite Sullivan, and her two sons, Dolman and his brother, Harold Glaisyer. In December 1976, Sullivan gifted her interest in the songs to Dolman. Dolman has thus held a two-thirds (2/3rds) interest in the songs at all times since 1976. He and his brother continue to conduct business as the Roy Shield Music Company.

Defendant-appellant Michael Agee did business under the names of defendant L & H Records and defendant The Nos-

employment with Victor, nor evidence that the songs were written at the instance and expense of HRS. Accordingly, the district court did not err in refusing to apply the work for hire doctrine.

[5] Moreover, even if Agee had established that Shield created the songs at the instance and expense of Victor or HRS, Dolman rebutted the work for hire presumption, which "is based on the presumed mutual intent of the parties, and does not operate as a matter of law." *May*, 618 F.2d at 1368.

[6] The district court was presented with the following evidence of the parties' mutual intent at the time the songs were written. First, Shield assigned his rights to the subject songs to Southern, which was owned by Victor. Had the works been intended to be works for hire for Victor, there would have been no reason for Southern to accept an invalid assignment of rights from Shield, knowing that its parent company already owned those rights. Following the assignment, Southern filed copyright registrations on the songs, naming Shield as the composer. Moreover, Southern later renewed the copyrights for some of the songs in Shield's name. Southern also assured Shield in writing that "[i]n the event any of these selections are not actively promoted by us, we agree to assign them to you on demand." Finally, in 1932, Southern licensed the synchronization rights in the songs to HRS. Had the songs been written for HRS as works for hire, there would have been no need for such a license.

[7] We hold that the above-cited evidence was sufficient to rebut the presumption that the songs composed by Shield were intended to be works for hire.[2]

---

[2]Agee also argues that the district court misappropriated the burdens of proof on the works for hire issue. To the contrary, the trial transcript shows that district court was well aware that the Dolman bore the ultimate burden of proof to rebut any credible evidence that the songs were composed as works for hire.

rights for the songs authored by Shield. Dolman moved for partial summary judgment as to twenty-five (25) songs, and his motion was granted on March 29, 1995. The district court then proceeded to a bench trial on the remaining issues.

On October 8, 1996, the district court issued its findings of fact and conclusions of law, holding in favor of Dolman. Judgment was entered for Dolman in the amount of $23,333.33 plus costs, and Agee was permanently enjoined from further infringement on October 18, 1996. On June 3, 1997, the district court awarded Dolman attorney's fees pursuant to 17 U.S.C. § 505 as the prevailing party. This appeal by Agee followed.

## DISCUSSION

### I.   Standards of Review

A grant of summary judgment is reviewed de novo. *Covey v. Hollydale Mobilehome Estates,* 116 F.3d 830, 834, *as amended by* 125 F.3d 1281 (9th Cir. 1997). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

A district court's findings of fact following a bench trial are reviewed for clear error, and its conclusions of law are reviewed de novo. Fed. R. Civ. P. 52(a); *Magnuson v. Video Yesteryear,* 85 F.3d 1424, 1427 (9th Cir. 1996).

### II.   The Subject Songs Were Not "Works for Hire"

Agee first argues that the district court erred in finding that the songs written by Shield were not works for hire. We agree with the district court.

[1] Under the Copyright Act of 1909, Act of March 4, 1909, ch. 320, 35 Stat. 1075 (codified at 17 U.S.C. §§ 1-216) (repealed), there is a rebuttable presumption that when an employer hires an employee or independent contractor to produce work of an artistic nature, the employer owns the copyright in the work. *See May v. Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1368 (9th Cir. 1980); *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965).[1] In *Lin-Brook*, we explained the "works for hire" doctrine in the following manner:

> [W]hen one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

*Lin-Brook*, 352 F.2d at 300.

[2] The work for hire presumption can be overcome by evidence of an agreement by which the employee or independent contractor retained the copyright in his work. *See May*, 618 F.2d at 1368-69. The employee-plaintiff bears the burden of proving by a preponderance of the evidence that such a contrary agreement was reached. *See Id.* at 1369.

[3] In the district court, Agee asserted the affirmative defense of work for hire. Before the work for hire presump-

---

[1] The district court properly applied the 1909 Copyright Act to determine whether the songs created by Shield in the 1930s were "works for hire" whose copyright presumptively vested in his employer. The 1909 Act is the applicable law in cases in which creation and publication of a work occurred before January 1, 1978, the effective date of the 1976 Act. *See Magnuson*, 85 F.3d at 1427.

tion could be invoked, however, Agee was required to present some credible evidence that Shield's work was done at the "instance and expense" of either Hal Roach or Victor. According to Agee, the evidence shows that the subject songs were composed at the "instance and expense" of HRS, and "in the course and scope of Shield's employment by Victor." The district court found that Agee failed to meet his initial burden of production on this issue, and we agree.

As evidence of work for hire, Agee points to the fact that at the time he authored the songs, Shield was working for Victor on HRS-produced movies. As noted above, in 1928, HRS and Victor entered into an agreement for the recording of sound in connection with the manufacture of motion pictures. The agreement remained in place until 1931, and the movies in question here were part of the performance of that contract. It is undisputed that Shield was an employee of Victor at the time the movies were produced and the songs in question were written.

Agee also cites letters from Southern to both Shield and Peer, in which Southern states that Shield's works had been composed for HRS. Finally, Agee presents invoices for Shield's "services," showing that he worked on the movies at issue.

[4] Dolman responds by pointing out that the invoices presented to the district court merely showed that Victor billed HRS for Shield's "services"; however, there was no indication as to what those "services" were. Dolman also notes that on the back of the allegedly infringing "Music Box" albums, Agee wrote that Leroy Shield was a "consultant" supplied by Victor to HRS. Shield's actual position at Victor as of 1926 was "Head of Artists and Repertoire for the Western United States" and, as of 1932, "Western Musical Director for RCA Victor's National Broadcasting Company." Dolman thus argues, and we agree, that there is neither evidence that composing music for HRS was within the scope of Shield's

talgia Archive (collectively referred to herein as "Agee"). After receiving permission from Hal Roach (Roach) and Earl Glick (Glick), the Chairman of HRS, Agee, a film historian and restorationist, caused to be manufactured and distributed "Music Box" phonorecords containing renditions of the songs at issue in this case. Agee also imported 150 CDs recorded by the Dutch "Beau Hunks" Orchestra, containing some of the subject songs.

While Agee was assured by Roach and Glick that HRS owned the music at issue, Agee had a copyright attorney, Walter Hurst (Hurst), investigate the copyright status of the songs prior to the release of the first "Music Box" album. Hurst reported to Agee that the copyright situation was "a mess." Nonetheless, Agee went forward with the release.

In 1990, Agee learned of the Roy Shield Music Company. Thereafter, he called Dolman and asked for biographical information on Leroy Shield. When Dolman learned about the distribution of the "Music Box" albums, he twice informed Agee in writing that he expected Agee to arrange for a license for use of the songs written by Shield. Agee did not respond to either of Dolman's letters until 1993, when Agee wrote Dolman a letter acknowledging Dolman's ownership of the music. However, Agee never offered to obtain a license from Dolman.

In June 1993, Dolman's lawyer sent Agee a letter demanding that he pay a license fee and account for sales to date of the allegedly infringing albums. In September 1993, the lawyer sent Agee documentation of Dolman's copyright ownership. A friend of Agee's then called Dolman's lawyer to request that, as part of any license, Dolman agree to indemnify Agee for any claims of ownership by third parties. Dolman declined to grant a license on those terms. Agee continued to sell the albums.

Dolman commenced this action on March 14, 1994, alleging a two-thirds (2/3rds) interest in fifty-five (55) song copy-

## III.  Agee Presented Insufficient Evidence of "Publication" of the Motion Pictures

Agee next contends that Shield lost his common-law copyright in the songs when the motion pictures were released. According to Agee, the prior publication of the motion pictures by distribution to film exchanges, without Shield's separate copyright notice for the songs, injected the underlying musical compositions into the public domain, and thus divested the musical compositions of their common-law copyrights. The district court rejected this argument, holding, as a matter of law, that the publication of a motion picture is not a publication of the underlying musical compositions.

Under the Copyright Act of 1909, a properly recorded artistic work receives copyright protection for 28 years from the date of first publication, and the author may renew the copyright term for an additional 28-year period. 1909 Act, ch.320, § 23, 35 Stat. 1075, 1080. Under the 1909 Act, an unpublished work was protected by state common-law copyright from the moment of its creation until it was either published or until it received protection under the federal copyright scheme. *La Cienega Music Co. v. ZZ Top*, 53 F.3d 950 (9th Cir.), *cert. denied*, 516 U.S. 927 (1995) (citations omitted). When a work was published, it lost common-law protection. *Id.* at 952-53. However, the owner could obtain federal protection for the published work by complying with the requirements of the 1909 Act. *Id.* at 953. If the owner failed to satisfy the Act's requirements, the work was injected irrevocably into the public domain. *Id.*

[8] We have held that "publication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public . . . ." *American Vitagraph, Inc. v. Levy*, 659 F.2d 1023, 1027 (9th Cir. 1981) (quoting *Nimmer on Copyright* § 4.04 at 4-18 to 4-19). However, "mere performance or exhibition of a work does not constitute a publica-

the copyrights, and being presented with evidence regarding Dolman's claim of ownership. The court granted summary judgment for Dolman; Agee appealed.

[1] Under the Copyright Act of 1909, there is a rebuttable presumption that when an employer hires an employee or independent contractor to produce work of an artistic nature, the employer owns the copyright in the work. [2] The presumption can be overcome by evidence of an agreement by which the employee or independent contractor retained the copyright. The employee bears the burden of proving that such an agreement was reached.

[3] Before the work for hire presumption could be invoked, Agee was required to present evidence that Shield's work was done at the instance and expense of either Hal Roach or Victor. [4] There was neither evidence that composing music for HRS was within the scope of Shield's employment with Victor, nor evidence that the songs were written at the instance and expense of HRS.

[5] Even if Agee had established that Shield created the songs at the instance and expense of Victor or HRS, Dolman rebutted the work for hire presumption, which is based on the presumed mutual intent of the parties, and does not operate as a matter of law. [6] Had the works been intended to be works for hire, there would have been no reason for Southern to accept an assignment from Shield, knowing that its parent already owned those rights. Southern filed registrations naming Shield as the composer, and renewed the copyright for some of the songs in Shield's name. Southern assured Shield that it would license the selections on demand, and licensed the synchronization rights to HRS. Had the songs been written as works for hire, there would have been no need for such a license. [7] The evidence was sufficient to rebut the presumption that the songs were intended to be works for hire.

[8] Publication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold,

---

faith belief in the innocence of his conduct. *See Columbia Pictures*, 106 F.3d at 293. According to Agee, any infringement was not willful because the title situation regarding the copyrights for the Shield songs was cloudy. Further, Agee claims that he had reason to believe that HRS, which gave him permission to use the songs, owned the copyrights. Agee did in fact have the approval of Roach and Glick of HRS to distribute the Music Box records. However, after consulting with copyright counsel, Agee was told that the situation with respect to the songs was "a mess."

As to the Beau Hunks' recordings, Agee imported those CDs after being solicited by a European licensee of HRS, who, it turns out, had rights to the music worldwide, except in the United States.

Agee also explains that he refused Dolman's offer to license the songs because Dolman would not promise to indemnify Agee in the event of a third-party claim. Agee contends that if Dolman had been sure that he was the titleholder, Dolman would have had no problem with such an indemnification agreement.

[15] Because Agee continued to infringe on the song copyrights when he knew that there was a question as to their ownership, and when he was presented with evidence that Dolman was the true owner, the district court did not err in finding that Agee's infringement was willful.

## V. The District Court Properly Awarded Attorney's Fees

The district court awarded Dolman attorney's fees pursuant to 17 U.S.C. § 505. That section allows the court, in its discretion, to award to the prevailing party reasonable attorney's fees as part of costs. Because we affirm the district court's findings as to Agee's liability, we affirm the attorney's fee

sumption of publication created by the film's copyright registration certificate.

In the 1930s, Leroy Shield was employed by Victor Talking Machine. He composed the musical portions of soundtracks Victor created for Laurel and Hardy movies produced by Hal Roach Studios (HRS) and released by Metro-Goldwyn-Mayer (MGM). MGM registered copyrights for all the movies.

Shield assigned his interest in the songs to Southern Publishing, Victor's music-publishing arm. In the assignment, Shield stated that his songs were free of liens or claims, and had not previously been assigned, transferred, or sold. Southern registered the original copyrights for the songs, naming itself as owner and Shield as composer, and granted a synchronization license to HRS.

Southern and the Songwriters' Guild renewed the song copyrights in Shield's name. By inheritance and gift, appellee Mahlon Dolman acquired a two-third interest in the songs.

After obtaining permission from HRS Chairman Earl Glick and Hal Roach, appellant Michael Agee began manufacturing "Music Box" recordings of some of the Shield songs. He also imported recordings of some of the songs made by the "Beau Hunks" Orchestra. Although Agee's attorney investigated the copyright status of the songs before the release of the first "Music Box" album, and reported that it was "a mess," Agee proceeded with the release.

After learning that Dolman and his brother were operating the Roy Shield Music Company for the purpose of licensing the songs during the renewal term, Agee asked for biographical information on Shield. Dolman found out that Agee was distributing the "Music Box" recordings and demanded that Agee obtain a license. Agee acknowledged Dolman's ownership rights, but did not seek a license.